**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

STEPHANIE K.,[1]                                              Case No. 1:22-cv-344

        Plaintiff,                                              Bowman, M.J.

    v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

**MEMORANDUM OPINION AND ORDER[2]**

Plaintiff Stephanie K. filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff asserts error relating to the ALJ's evaluation of her subjective symptoms regarding her combined impairments, "especially fibromyalgia." (Doc. 9 at 1, PageID 2173). For the reasons stated, the ALJ's decision is supported by substantial evidence in the record and therefore is AFFIRMED.

**I.  Summary of Administrative Record**

On August 18, 2017, Plaintiff filed an application seeking disability insurance benefits ("DIB"), alleging a disability onset date of September 6, 2016 based upon cognitive issues, a transient ischemic attack ("TIA"), fatigue, fibromuscular dyspasia, s/p bilateral dissection carotid artery, fibromyalgia, word finding difficulties, anxiety,

---

[1] Due to significant privacy concerns in social security cases, claimants in social security cases are referred to only by their first names and last initials.  *See* General Order 22-01.
[2] The parties have consented to disposition by the undersigned magistrate judge. *See* 28 U.S.C. § 636(c).

1

hyperlipidemia, and hypertension (Tr. 15, 145). After Plaintiff's application was denied initially and upon reconsideration, she sought an evidentiary hearing. On September 6, 2019, Plaintiff appeared at a video hearing, through counsel, and gave testimony before Administrative Law Judge ("ALJ") Kathleen Kadlec; a vocational expert also testified. (Tr. 91-123). On December 3, 2019, ALJ Kadlec filed an adverse written decision in which she determined that Plaintiff could not perform her prior work, but remained capable of performing other jobs that existed in significant numbers in the national economy. (Tr. 167-186). Plaintiff appealed, and on October 1, 2021, the Appeals Council remanded for reconsideration of Plaintiff's mental impairments.

Following remand from the Appeals Council, the case was reassigned to ALJ Deborah Sanders. On February 4, 2021 Plaintiff appeared and provided testimony at a new evidentiary hearing; a vocational expert also testified. (Tr. 49-90). Plaintiff was 49 years old on her alleged disability onset date in the "younger individual" age category; but changed age categories to "closely approaching advanced age" less than a year later. She is married, with a high school education, and lives in a single-family home with her husband. She has past relevant work as an officer manager, customer service representative, data entry clerk, accounts payable accounting clerk and administrative assistant. (Tr. 82-83).

Plaintiff had a TIA in May 2015 but returned to her office manager position after that event. However, she quit working in September 2016 because she was "making a lot of mistakes" and "forgetting" how to perform routine duties such as payroll. (Tr. 68). She reported the "final straw" was getting lost while driving to her parents' house, after which event she voluntarily resigned from her office manager position. (*Id.* at 68-69).

On March 2, 2021, ALJ Sanders issued a new adverse written decision. (Tr. 15-42). The ALJ determined that Plaintiff has severe impairments of: "transient ischemic attack, mild vascular neurocognitive disorder secondary to fibromuscular dysplasia and carotid artery disease, arterial fibromuscular dysplasia, headaches, obstructive sleep apnea, degenerative disc disease of the cervical spine, osteoarthritis of the left knee, fibromyalgia, emphysema, and an adjustment disorder with anxiety and depression." (Tr. 18).[3] In addition, the ALJ found numerous nonsevere impairments, including: alcohol abuse, knots on her fingers and some contracture of her left hand, a mass and/or abscess on her left chest wall, cellulitis, plantar facial fibromatosis, hypertension, hyperlipidemia, and folic acid, vitamin D and Vitamin B12 deficiencies. (Tr. 19-21). Plaintiff does not dispute the ALJ's determination of which impairments were severe, nor does she challenge the determination that none of her impairments, either alone or in combination, met or medically equaled any Listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff would be entitled to a presumption of disability. (Tr. 21)

The ALJ agreed with Plaintiff that she cannot perform her past relevant work, all of which was either skilled or semi-skilled in nature and performed at the sedentary level. However, the ALJ determined that Plaintiff retains the residual functional capacity ("RFC") to perform a restricted range of unskilled work at the light exertional level, subject to the following limitations:

> [N]o overhead reaching bilaterally; frequent reaching in all other directions bilaterally; frequent handling and fingering; occasional climbing ramps and stairs; frequent balancing; occasional stooping, kneeling, crouching, and crawling; never climb ladders; never work at unprotected heights; occasionally operate a motor vehicle; occasional exposure to vibration; can

---

[3]The same "severe" and "nonsevere" impairments were previously found by ALJ Kadlec (Tr. 169).

> perform simple, routine, repetitive tasks but not at a fast production rate pace and no strict production quotas; occasional interaction with coworkers, but no tandem or shar[e]d task or any task requiring supervision or persuasion of others; occasional interaction with supervisors, but no over the shoulder supervision; occasional interaction with the public, but not in a customer service capacity; able to adapt [to] infrequent changes in the work setting.

(Tr. 25). Considering Plaintiff's age, education, and RFC, and based on testimony from the vocational expert, the ALJ determined that Plaintiff could still perform jobs that exist in "significant numbers" in the national economy, including the representative occupations of packing and filling machine tender, sorter, and mail clerk. (Tr. 40-41). Therefore, Plaintiff was not under a disability. (*Id*.) The Appeals Council denied further review, leaving the ALJ's decision as the final decision of the Commissioner.

In her appeal to this Court, Plaintiff argues that the ALJ erred when she failed to account for the "total limiting effects" of Plaintiff's combination of "severe" impairments, especially fibromyalgia. The Court finds no reversible error.

**II. Analysis**

**A. Judicial Standard of Review**

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by

4

substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted). *See also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (holding that substantial evidence is evidence a reasonable mind might accept as adequate to support a conclusion and that the threshold "is not high").

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to

the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§ 404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job.  42 U.S.C. § 423(d)(1)(A).

### B.  Plaintiff's Challenge to the Credibility/Consistency Determination[4]

In her sole claim of error, Plaintiff argues that the ALJ erred by failing to fully credit her self-described limitations. In lieu of fully accepting Plaintiff's subjective reports that her limitations were disabling, ALJ Sanders determined that her "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 28). Plaintiff contends that her subjective complaints of postural limitations and fatigue and cognitive-related limitations were incompatible with the ALJ's RFC. However, the ALJ found those subjective reports to be "inconsistent" for multiple reasons, including but not limited to the fact that the "objective medical record does not support the claimant's allegations of disability." (*Id.*)  While Plaintiff maintains that the ALJ should have fully credited her

---

[4]Plaintiff's counsel cites to PageID numbers without a corresponding cite to the Administrative Transcript. The same counsel has been repeatedly warned that <u>local rules require a citation to the Administrative Transcript</u>.  *See, e.g.*, Case No. 1:20-cv-602, 2021 WL 6125024 (S.D. Ohio Dec. 28, 2021). The Court's patience with counsel's continued failure to comply with this requirement is wearing thin. Local Rule 7.2(b)(3) requires pinpoint citations to PageID numbers "[e]xcept for Social Security cases....". For Social Security cases, Local Rule 8.1.A(d) requires "pinpoint citations to the administrative record, regardless of whether a party also chooses to provide PageID citations."

subjective reports, she alternatively argues that even if those self-described limitations were only "partially credited," she would have been presumptively disabled once she attained the age of 50 under the Grid Rules. (Doc. 9 at 7, PageID 2179). The Court finds no reversible error.

### 1.  Legal Standard for the Assessment of Subjective Symptoms

An ALJ's assessment of subjective symptoms, formerly referred to as the "credibility" determination in SSR 96-7p, was clarified in SSR 16-3p to remove the word "credibility" and refocus the ALJ's attention on the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." SSR 16-3p, 2017 WL 5180304 at *2 (October 25, 2017). The revised ruling emphasizes that "our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation." *See id.* at *11. Under SSR 16-3p, an ALJ is to consider all of the evidence in the record in order to evaluate the limiting effects of a plaintiff's symptoms, including the following factors:

1.  Daily activities;

2.  The location, duration, frequency, and intensity of pain or other symptoms;

3.  Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id.*, 2017 WL 5180304, at *7–8; *see also* 20 C.F.R. §§ 404.1529(c), 416.929(c) and former SSR 96-7p.

Despite clarifying the basis for the analysis and elimination of the term "credibility" from the text in order to avoid "character analysis," SSR 16-3p was not intended to substantially change existing law. *See Banks v. Comm'r of Soc. Sec.*, Case No. 2:18-cv-38, 2018 WL 6060449 at *5 (S.D. Ohio Nov. 20, 2018) (quoting explicit language in SSR 16-3p stating intention to "clarify" and not to substantially "change" existing SSR 96-7p), adopted at 2019 WL 187914 (S.D. Ohio Jan. 14, 2019); *Duty v. Comm'r of Soc. Sec.*, 2018 WL 4442595 at *6 (S.D. Ohio Sept. 18, 2018) ("existing case law controls to the extent it is consistent with the clarification of the rules embodied in SSR 16-3p's clarification.").[5] Thus, it remains the province of the ALJ and not the reviewing court, to assess the consistency of subjective complaints about the impact of a claimant's symptoms with the record as a whole. *See generally Rogers v. Comm'r*, 486 F.3d 234, 247 (6th Cir. 2007).

Plaintiff faces an uphill battle under the case law; an assertion of error in a credibility/consistency determination requires a particularly strong showing. Like the ultimate non-disability determination, the assessment of subjective complaints must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is

---

[5]The elimination of the word "credibility" from SSR 16-3p can make application of the prior case law semantically awkward, insofar as virtually all of the case law interpreting the former SSR 96-7p uses the catchphrase "credibility determination."

charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Further, a credibility/consistency determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Thus, it is proper for an ALJ to discount the claimant's testimony where there are inconsistencies and contradictions among the medical records, her testimony, and other evidence. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004).

Even Plaintiff acknowledges that the ALJ's determination here is supported by "some evidence." (Doc. 13 at 2, PageID 2213). The Court is particularly mindful of its limited role to review whether that evidence is "substantial" enough to affirm the ALJ's decision, even if a good deal of evidence exists in Plaintiff's favor. Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994).

### 2. Plaintiff's Fibromyalgia and the Light Work RFC

Plaintiff's argument focuses on whether the ALJ properly considered the "total limiting effects" of her impairments, "especially fibromyalgia." (Doc. 9 at 1, PageID 2173). Plaintiff appears to have been diagnosed with fibromyalgia ("FM") by Dr. Houk, a rheumatologist,[6] in February 2017. Despite the fact that relatively few documents of

---

[6]Apart from two brief evaluative appointments and diagnosis of FM, Dr. Houk did not treat Plaintiff as he found "no indication of rheumatology disease." Tr. 1402).

9

record address fibromyalgia, both ALJ Kadlec and ALJ Sanders cited to Dr. Houk's diagnosis in concluding that Plaintiff's FM was a "severe" impairment at Step 2.[7]

Plaintiff maintains that the cognitive symptoms, postural limitations and fatigue levels caused by her FM and to which she testified were work preclusive.[8] Plaintiff emphasizes the "waxing and waning" nature of fibromyalgia to explain away the inconsistencies in the record on which the ALJ relied to partially discredit her subjective complaints. However, the diagnosis of fibromyalgia says little about the degree of functional impairment. In 2012, the Social Security Administration published SSR 12-2p to provide additional guidance in the evaluation of fibromyalgia. 2012 WL 3104869 (July 25, 2012). As SSR 12-2p explains, fibromyalgia "is a common syndrome," 2012 WL 3104869 at *2, and most people with fibromyalgia suffer less than disabling limitations even if their symptoms "wax and wane." *See Vance v. Comm'r of Soc. Sec.*, 260 Fed. Appx. 801, 806 (6th Cir. Jan. 15, 2008) (quoting *Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996)) ("Some people may have a severe case of fibromyalgia as to be totally disabled from working ... but most do not and the question is whether [claimant] is one of the minority."); *accord Tyrpak v. Astrue*, 858 F. Supp.2d 872 (N.D. Ohio 2012) (affirming

---

[7]Despite finding FM to be a severe impairment at Step 2, ALJ Kadlec pointed out that the record "reflects inconsistent diagnoses" regarding FM, including: (1) inconsistent findings by Dr. Houk that she had "no tenderness" but yet also had greater than 11/18 tender points; (2) April and July 2018 notes by her neurologist, Dr. Ford, stating that he suspected her symptoms were caused by panic attacks; (3) a lack of tenderness or FM symptoms on other exams that suggested insufficient duration. (Tr. 178-179). ALJ Sanders' discussion is more cursory. She simply states that she considered FM under the relevant diagnostic criteria before summarily concluding that FM is "a medically determinable impairment." (Tr. 19). She later refers to fibromyalgia in her discussion of Plaintiff's cognitive complaints, which Dr. Ford at one point suggested were "most likely due to her fibromyalgia." (Tr. 28). Last, ALJ Sanders cites to a November 2020 record in which another provider suggests that many of Plaintiff's symptoms were not due to fibromuscular dysplasia or atherosclerotic disease, but more likely to her cervical spine issues **or** fibromyalgia. (Tr. 29).

[8]Plaintiff primarily testified that her FM caused pain symptoms before the ALJ. (*See* Tr. 73-75).

ALJ determination that plaintiff who suffered from fibromyalgia, back impairment, major depressive disorder and obesity could still perform light work, holding that ALJ articulated good reasons for rejecting unsupported opinions of primary care physician and treating rheumatologist). Thus, an ALJ may find fibromyalgia to be a severe impairment, and still appropriately discredit the plaintiff's subjective complaints that it is disabling. *See Luukkonen v. Comm'r of Soc. Sec.*, 653 Fed. Appx. 393, 400 (6th Cir. 2016). That is what the ALJ did here.

Plaintiff criticizes the ALJ's analysis as not "reasonable" because the ALJ allegedly relied upon a "highly selective" treatment of the record that ignored the variability of her FM symptoms. However, the argument that the ALJ mischaracterized or "cherry-picked" the record is frequently made and seldom successful, because "the same process can be described more neutrally as weighing the evidence." *White v. Commissioner,* 572 F.3d 272, 284 (6th Cir. 2009). The narrow scope of judicial review of the Commissioner's final administrative decision does not include re-weighing evidence, deciding questions of credibility, or substituting the court's judgment for that of the ALJ. *See Ulman v. Commissioner,* 693 F.3d 709, 713 (6th Cir. 2012).

Here, the ALJ appropriately began her analysis with a summary of Plaintiff's long list of complaints, noting some internal inconsistencies. (Tr. 26-27). For the Court's convenience, a portion of that summary is quoted verbatim:

> She claimed to have trouble walking due to balance issues. (2019 hearing testimony). She indicated her left leg would go numb if she walked far. She claimed she could not squat without falling. (Exhibit 1E). She claimed sometimes her knee would give out. (2019 hearing testimony). … She indicated she had difficulty lifting, kneeling, climbing stairs, with memory, completing tasks, concentrating, and understanding. She indicated that sometimes she could not walk around a block. (Exhibit 6E). She testified she could move around for three to four hours before she had to sit down in

her recliner. She claimed sometimes she was in her recliner all day, but otherwise would rest in it two or three times a day for twenty to thirty minutes at a time. … She claimed she could only stand for ten to fifteen minutes at a time. (2019 hearing testimony). At a later hearing, she indicated she could stand for thirty minutes at a time. (2021 hearing testimony). She testified she could walk for about thirty minutes on a flat surface. (2019 hearing testimony). Later, she claimed she could walk for fifteen to twenty minutes at a time. (2021 hearing testimony). She claimed sitting excessively caused her back to swell. (2019 hearing testimony). She testified that sitting caused her legs to go numb. (2021 hearing testimony). She indicated she could not pay attention for long unless she was one on one. She indicated she could follow written instructions, but she could only follow spoken instructions depending on how complicated they were.

(Tr. 26-27).

The ALJ also noted Plaintiff's varying reports of day-to-day activities:

{S}he indicated if she did anything strenuous, such as just cleaning her home, she would be in bed for two days due to exhaustion. (Exhibit 1E). She claimed to pick a chore a day to do. She could do laundry, rake leaves, and [d]o the dishes. (Exhibit 6E). She testified her spouse sometimes helped when doing chores, but that normally she did all the chores. She testified the only chore she could not do was vacuuming, as sometimes she gets winded. (2019 hearing testimony). She testified she would clean on a typical day and run errands with her spouse. Later in that same hearing, she claimed she could not clean. (2021 hearing testimony).

(Tr. 27).

The ALJ pointed out that with respect to cooking, she testified that she would not cook alone because she would forget things but she also reported that she used recipes and typically fixed breakfast and dinner daily.  (Tr. 27).  With respect to driving, she reported both that she could drive and would drive short distances by herself, but also claimed that she could not drive. (*Id.*) At her 2021 hearing, "she indicated she would drive once every couple of weeks" (*Id.*) In terms of shopping and finances, she reported she "could shop in stores and online," "could manage her own money," and "would shop for groceries with her spouse once every two weeks." (*Id.*) However, she also claimed her

spouse handled her finances. (2019 hearing testimony). In terms of social activities, she reported spending time with family members, mostly at home, some reading (noting that short-term memory impairment is an issue if she does not read every day), looking things up on a computer, and watching television. She also reported helping an elderly neighbor who lived down the street, including going over to sit with her and going to the store for her. Sometimes her granddaughter would come over. (Tr. 27).

As stated, Plaintiff's claim of error focuses on the ALJ's adverse evaluation of her subjectively reported symptoms (cognitive deficits, postural limitations and fatigue). Plaintiff contends that if the ALJ had fully accepted Plaintiff's testimony about the disabling nature of her "fibro fog," the ALJ would have included a work-preclusive "off task" limitation. In response to questioning from counsel, the VE testified that an employer would not tolerate an employee being off task more than 10% of the day, and/or that a high rate of mistakes could lead to termination. (Tr. 85). In similar fashion, Plaintiff argues that if the ALJ had fully accepted Plaintiff's description of her fatigue including that she could stand and/or walk for no more than 15-20 minutes, the ALJ would not have deemed her capable of light work, which requires standing up to 6 hours per workday. *See* 20 C.F.R. § 404.1567(b). If limited to the sedentary exertional level, Plaintiff would be entitled to a presumption of disability under Grid Rule § 201.14 once she attained the age of 50.

The Court agrees that individuals with fibromyalgia may well have symptoms that wax and wane. For that reason, SSR 12-2p emphasizes consideration of the longitudinal record. However, a diagnosis of FM does not mean that an ALJ is barred from evaluating the consistency of subjective complaints under SSR 16-3p. Nor is objective evidence wholly irrelevant whenever a claimant suffers from fibromyalgia. Indeed, SSR 12-

2p requires "sufficient <u>objective evidence</u> to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity." See *Herzog. Comm'r of Soc. Sec.,* 2012 WL 3104869 at *4 (emphasis added). In addition, SSR 12-2p makes clear that "[i]f objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms, we consider all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms." Because the ALJ here cited to substantial evidence that supports her adverse credibility/consistency evaluation of subjective complaints, the Court finds no error.

### a. The ALJ's Evaluation of Plaintiff's Cognitive Deficits

Plaintiff generally testified that she was easily distracted and that severe short-term memory impairment makes her constantly forgetful. Plaintiff first noticed her cognitive impairment following a TIA from a carotid dissection that led to a subsequent neurocognitive disorder in September 2015. (Tr. 28). She testified that the primary reason she quit work as an office manager in 2016 was due to her cognitive impairment, including memory issues that caused her to make mistakes. Reviewing the evidence, the ALJ agreed that Plaintiff had cognitive limitations due to her combined impairments of a history of TIA, fibromyalgia, and a mild vascular neurocognitive disorder secondary to fibromuscular dysplasia and carotid artery disease. Additionally, the ALJ acknowledged

14

the April 2017 neuropsychological testing that showed signs of depression with anxious distress. (Tr. 34).

The ALJ reasonably considered and explicitly discussed complex records that suggested multiple potential causes for Plaintiff's cognitive issues, including the hypothesis of a treating neurologist that her continued complaints were not caused by her fibromuscular dyspasia but instead by either FM or by a reaction to her medication. (Tr. 28, citing Tr. 1888; *see also* Tr. 34, citing Tr. 1887 (noting cognitive complaints had previously improved with topiramate and dietary change, and may be panic attacks); *see generally*, Tr. 1601-02 (hypothesis that "with better treatment of her pain and fatigue, she will have improvement in her cognition as well," and that symptoms may be caused by combination of right frontal lesion and fibromyalgia). However, the ALJ also cited to numerous examination records throughout the disability period in which Plaintiff was found to be alert and oriented, with intact cognition and fund of knowledge, and intact recent and remote memory. (Tr. 34-35, citing records; *see also* Tr. 641, 645 (neurological exam reflecting no significant issues with memory, cognition or attention)).

The Court finds no error in the ALJ's assessment that, despite significant cognitive limitations, Plaintiff is not disabled by her mental impairments. Importantly, the ALJ credited much of Plaintiff's testimony, agreeing that Plaintiff could no longer perform any type of skilled or even semi-skilled work.[9] To accommodate for Plaintiff's impaired

---

[9]Plaintiff argues that the ALJ should have considered her "stellar work history of 25 years" including her attempts to return to work after her disability onset, as evidence supporting a more favorable credibility/consistency finding. Plaintiff argues that the ALJ erred by failing to consider this "highly relevant factor." (Doc. 9 at 18, PageID 2190). However, there is no legal requirement that the ALJ explicitly discuss work history. *See Dutkiewicz v. Comm'r of Soc. Sec.*, 663 Fed. Appx. 430, 433 (6th Cir. 2016). In any event, the ALJ clearly did consider the prior work history in determining she could no longer perform her longstanding skilled managerial work.

memory and word-finding difficulties from combined impairments, the ALJ limited her to unskilled work that involved only "simple, routine, repetitive tasks but not at a fast production rate pace and no strict production quotas" with the ability to adapt to only "infrequent changes in the work setting." (Tr. 25). To accommodate for distractibility as well as social limitations, the ALJ further limited her to "occasional interaction with coworkers, but no tandem or shared task or any task requiring supervision or persuasion of others; occasional interaction with supervisors, but no over the shoulder supervision; [and] occasional interaction with the public, but not in a customer service capacity." (*Id.*)

In addition to the medical records and Plaintiff's subjective reports, the ALJ discussed the expert opinions of three psychological consultants. On December 16, 2017, a consultative psychological examiner, Dr. James Rosenthal, noted that Plaintiff had some word finding difficulty and had no recall of three words after a five-minute delay, but recognized all three words when given choices. Two reviewing psychological consultants offered mental RFC opinions based in part on Dr. Rosenthal's report. (*See* Tr. 36-37). The ALJ largely accepted their opinions that Plaintiff has moderate limitations in multiple psychological and cognitive areas, but can still follow simple instructions and follow and maintain attention for simple tasks. (*Id.*) However, the ALJ added some limitations based upon more recent therapy records that suggested a degree of social limitation that had not been considered by the consultants. (*Id.*)

No psychologist or physician opined that Plaintiff's cognitive impairments cause disabling "off-task" limitations, and none opined that Plaintiff's limitations were greater

than the mental (or physical) RFC as determined.[10] Based upon the ALJ's explicit consideration of and citation to substantial evidence of record, the Court finds no error in the ALJ's determination that her cognitive limitations were not disabling.

### b.  The ALJ's Evaluation of Plaintiff's Physical Limitations

Plaintiff also testified to a level of postural limitations and fatigue that would have been disabling if fully credited. For example, Plaintiff's testimony that she could stand and/or walk for no more than 15-20 minutes at a time was incompatible with the ALJ's determination that she retains the exertional RFC to perform light work, which requires standing "a good deal" or up to 6 hours per day. *See* SSR 83-10, 1983 WL 31251, at *6; *see also* 20 C.F.R. § 416.967(b). If the ALJ had instead limited her to sedentary work, Plaintiff would have been presumptively disabled in July 2017 under Grid Rule § 201.14.

Plaintiff also endorsed a level of profound fatigue and need for naps that would have been incompatible with sustaining *any* work. For example, Plaintiff testified that if she watches her grandchildren for a day, she needs a day of rest the next day or "may be two or three." (Tr. 75-76). She testified that she did not believe she could sustain fulltime work because she cannot predict from week to week what she will be able to do. (Tr. 79; *see also* Tr. 2006 ("if I push myself at all the fatigue sets in and I am bed bound.")). In response to questioning from Plaintiff's counsel regarding Plaintiff's alleged need for a daily nap, the VE testified that an individual who must be provided an additional break to nap one hour during the workday is unemployable. (Tr. 84-85)

---

[10]Plaintiff references statements by treatment providers in a way that implies that they rendered work-preclusive opinions. (Doc. 9 at 12, PageID 2184). The ALJ adequately explained why the cursory notes were not medical opinions, (Tr. 38-39), a conclusion with which this Court agrees.

Many claimants who experience some level of chronic pain and fatigue remain capable of full-time work. Here, the ALJ declined to fully credit Plaintiff's subjective reports about her postural limitations and alleged need for daily naps. In addition to the inconsistencies noted in the summary of her complaints, the ALJ described the following inconsistencies in the record:

> For instance, she told recent treatment providers that she could no longer do any housework, yet testified at the hearing that she could still do errands, do the laundry, and assist an elderly neighbor. (Hearing testimony; Exhibit 31F, page 85). She claimed her knee would give out and that she could not squat without falling. (2019 hearing testimony; Exhibit 1E). However, the medical record did not document any falls.

(Tr. 39; *see also* Tr. 28, noting report of occasional unsteadiness without falling; Tr. 1267-68, reporting "no pain"). During her December 2017 psychological exam, Plaintiff reported a significant level of daily activity, including doing "most of the housework including laundry, cooking, and housecleaning" and running errands 3-4 days per week. (*See also generally*, Tr. 36, 39).

Additionally, the ALJ discussed the objective medical evidence relating to Plaintiff's left knee and cervical spine, including both imaging and clinical evidence that reflected an "often intact" gait that was "[r]arely" irregular. (*See*, *e.g.*, Tr. 32). The ALJ noted Plaintiff's regular contact with her three adult children and grandchildren. (*See* Tr. 27, 31). While Plaintiff reported that her pain increases with activities like pulling weeds, she simultaneously reported that her medication "does help some with her pain." (Tr. 1991).

Consistent with SSR 16-3p, the ALJ further reasoned that Plaintiff's medications often offered significant symptom relief (at least to a level that was not disabling), and that other records did not fully support Plaintiff's complaints about falls, fatigue, and difficulties with turning her head.

18

> There were periods were her pain was significant[ly] improved with medication and she was able to perform activity far in excess of what she alleged. For example, she was noted to have good exercise habits when the weather was warming and would walk a mile and a half a day…. She could do household activities and pull weeds…. She was able to help move, and believed she may have hurt her neck when doing so. …At times, she stated that she would clean on a typical day, but then also claimed she could not clean. (2021 hearing testimony). Despite describing significant symptoms with sitting for long periods, she was able to take a vacation on a long car trip [in October 2017[11]] through the southwest to San Diego to visit family. (Exhibit 12F, page 5). While she claimed to have issues turning her head, she repeatedly had normal range of motion in her neck during examinations.

(Tr. 39).

The ALJ discussed a great number of records over the entirety of the disability period. For example, the ALJ pointed out that Plaintiff initially had reported fatigue after her TIA but that she had been able to continue working fulltime through August 2016. (Tr. 28). The ALJ did not ignore evidence in Plaintiff's favor, acknowledging that Plaintiff reported profound fatigue from September 2016 through February 2017, during which time she was seeking a diagnosis to explain her myriad symptoms. (*Id*.; *see also* Tr. 655, 724). And in November and December 2016, she reported episodes of fatigue that would last for days, along with general muscle weakness and numbness in her hands and feet. (Tr. 30; see also Tr. 28). Despite continued reports of fatigue in February 2017, she received a fibromyalgia diagnosis and began treatment that same month. (Tr. 28, 30; *see also* Tr. 655).

Weeks later in March 2017, she "sometimes felt her medication was working" to reduce her pain symptoms, (Tr. 31, citing Tr. 725), but still reported "pain as the day goes

---

[11]The referenced driving distance exceeds 2200 miles. In addition, the record reflects that Plaintiff took another trip to CA in October 2019, (*see* Tr. 1990).

on." (Tr. 725; *see also* Tr. 1403, April 2017 report that Cymbalta "works if I don't do anything."). Her neurologist also prescribed aqua therapy but she quit within a month because it was too exhausting. (Tr. 31; Tr. 721). Still, she reported that she was engaged in physical therapy, was cleaning the house "as much as she can" and tak[ing] care of the kids when they visit." (Tr. 687 ).

By October 2017, Plaintiff was reporting more energy and little to no pain. (Tr. 31; *see* Tr. 716-717, report in October 2017 that she took her mom out of town, had no muscle aches, no fatigue, and was exercising occasionally). By December 2017, her symptoms had significantly improved. (See Tr. 1403, "reported she became pain free, had energy and everything was great, went on vacation feeling great, then on December 9 2017 had an 'episode'"). In January 2018 she reported that her pain remained well controlled but her fatigue was "*starting* to return." (Tr. 1403 (emphasis added)). At that time, she reported having 10-15 minute episodes of weakness every other day that her neurologist suspected might be panic attacks. (Tr. 1410).

The ALJ noted records from 2018 continued to reflect some improvement of both cognitive and physical symptoms and relative stability on her medications. For example, in April 2018, she reported her fatigue was not bad and that "all in all she was feeling okay." (Tr. 28, citing Tr. 1377). Doctors noted in July 2018 that her severe level of fatigue was not explained by *any* medical findings, nor was there an explanation in brain imaging for her cognitive complaints. (Tr. 28 citing Tr. 531-532; *see also* Tr. 515, 8/15/18 note that she does "yardwork and housework" and reports left wrist pain with activity such as pulling weeds; Tr. 524, 7/23/18 note that medication "is helping" but that may have injured her neck while moving"). By August 2018 she reported muscle aches but no muscle

weakness, that she was doing well on her medications, and had no exercise intolerance or fatigue, with "normal" memory. (Tr. 31; Tr. 1768). In September 2018, she reported chronic muscle aches with weakness in her left leg, but also that she exercised during warmer weather and would walk one and a half miles per day. (Tr. 31 *see also* Tr. 509-10, 9/28/18 note that "energy level is good" despite report of chronic muscle aches, no pain on exam, no memory lapses or loss, no difficulty walking).

The ALJ reviewed similar records from 2019 that reflected some improvement, (*see* Tr. 31, citing Tr. 1779 (May 2019 report her fatigue was "improved"), but again did not ignore other records that corroborated her subjective reports of continued fatigue. (Tr. 32). The ALJ discussed similarly mixed records from 2020. (*Id*., citing Tr. 1990-1991 report that medication did help, but that pulling weeds increased pain); *see also* Tr. 1986 "tires easily if she does too much"; Tr. 2006, report that she became "bed bound" if she pushes herself).  However, the ALJ contrasted those reports with Plaintiff's 2021 hearing testimony, during which she described more activities and did not describe herself as bedbound. (Tr. 32).

Plaintiff insists that the multiple inconsistencies cited to by the ALJ all should have been attributed solely to "the nature of fibromyalgia." (Doc. 9 at 13, PageID 2185). She insists that a higher level of functioning on "good days" should not have be used to discredit her testimony that she would be unable to work fulltime "on a regular and continuous basis." She asserts that the ALJ's failure to acknowledge the variability of FM symptoms in particular requires reversal.

Ultimately, however, Plaintiff's argument boils down to a request for this Court to re-weigh the evidence in her favor. The Court agrees with Plaintiff that substantial

evidence exists to support a finding that her fatigue and physical limitations preclude her ability to sustain full-time work over time, although it is less clear that substantial evidence exists to support a disabling level of cognitive impairment. But the fact that substantial evidence exists to support Plaintiff's position is not enough for reversal or remand. That is because, viewing the totality of the record there is also "more than a scintilla" (i.e., substantial evidence) to support the ALJ's decision. In other words, the inconsistencies cited by the ALJ are legally sufficient to substantially support her adverse credibility/consistency determination and the RFC as determined. Thus, the ALJ's decision falls within an acceptable "zone of choice."

### III. Conclusion and Order

For the reasons stated, substantial evidence supports the ALJ's adverse credibility/consistency finding as well as the RFC and nondisability determination. Accordingly, **IT IS ORDERED THAT** Defendant's decision be **AFFIRMED** and that this case be **CLOSED.**

 *s/Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge